NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| U.S. SECURITIES & EXCHANGE COMMISSION, | No. 20-17419 |
| Plaintiff-Appellee, | D.C. No. 3:17-cv-00223-RS |
| v. | MEMORANDUM* |
| PRITZKER LEVINE LLP, | |
| Appellant, | |
| ——————————————— | |
| SUSAN L. UECKER, | |
| Receiver-Appellee. | |

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, Chief District Judge, Presiding

Argued and Submitted October 21, 2021
San Francisco, California

Before: WATFORD and HURWITZ, Circuit Judges, and BAKER,** International
Trade Judge. Dissent by Judge BAKER.

———————————

\* This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

\*\* The Honorable M. Miller Baker, Judge for the United States Court of
International Trade, sitting by designation.

In 2015, Allan Young, represented by Pritzker Levine LLP ("Pritzker"), sued Thomas Henderson and the San Francisco Regional Center, LLC ("SFRC") in California state court, alleging mismanagement of EB-5 qualifying business entities and misappropriation of investor funds.[1] Pritzker obtained the appointment of a receiver and assisted the receiver in identifying nearly $29 million in assets that were taken into the receivership estate. The firm spent approximately 2,000 hours litigating the state court proceedings.

Two years later, the SEC sued Henderson and SFRC in federal court. The state court litigation was stayed, a receiver was appointed in the federal case, and roughly $25 million from the state receivership was turned over to the federal receiver. After the district court approved the receiver's proposed plan of distribution, Pritzker unsuccessfully sought an award of attorney fees for its role in securing a "common fund" for investors. Pritzker appeals the denial of its fee application.

1. Under the "common fund" doctrine, "a private plaintiff, or his attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of his litigation, including

---

[1] The Employment-Based Immigration Fifth Preference Program ("EB-5") offers legal permanent residency to foreign nationals who make a "direct investment of at least $1 million in a new commercial enterprise that creates at least ten full-time jobs for U.S. workers." *SEC v. Hui Feng*, 935 F.3d 721, 725 (9th Cir. 2019) (citing 8 U.S.C. § 1153(b)(5)).

attorneys' fees." *Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977). Pritzker's efforts in the state court litigation—which included filing the case, obtaining the appointment of a receiver, working closely with the receiver in amassing the receivership fund, and defending the fund against various claims—undeniably caused the creation, discovery, increase, or preservation of a common fund that benefited investors at the conclusion of the federal action. *See Indep. Living Ctr. of S. Cal., Inc. v. Kent*, 909 F.3d 272, 285 (9th Cir. 2018). The state receiver, who later became the federal receiver, stated "Pritzker Levine undeniably rendered services that resulted in a benefit to the Federal receivership estate (investors and creditors)," and that "[a]bsent the actions taken by Pritzker Levine in obtaining the appointment of the receiver in the State Court Action, the Receiver has no doubt that Henderson and SFRC would have stripped all of the assets (or value) out of the entity Defendants and Relief Defendants, leaving not a penny for investors (or creditors)." The district court's speculation that the funds transferred from the state receiver might still have been recovered by the federal receiver in the absence of the state receivership therefore finds no support in the record and in any event does not demonstrate that Pritzker's efforts were not a "cause-in-fact" of the creation, increase, or preservation of a common fund. *See Vincent*, 557 F.2d at 771 n.10 (explaining that "the common fund doctrine requires that the work of the attorney seeking an extra fee be *a* cause-in-fact of any claimed benefit to the fund,"

3

but not *the only* cause-in-fact) (emphasis added). We reverse the order denying fees and remand for a determination of a reasonable award in light of Pritzker's contributions.[2]

2.      Pritzker's fee award should be treated as an allowed administrative claim. The purpose of the common fund doctrine is to permit the burden of litigation expenses "to be *shared* among those who are benefited by the litigant's efforts." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir. 1989). To accomplish this, the doctrine must be applied such that "the fee can be shifted with some exactitude to those benefiting." *Id.* (quoting *Petition of Hill*, 775 F.2d 1037, 1041 (9th Cir. 1985)). Accordingly, the fee payment must come "from the fund itself, as a prior charge before the beneficiaries receive it." *City of Klawock v.*

---

[2]      In its brief, the SEC suggested that 15 U.S.C. §§ 77t(f) and 78u(d)(4) represent Congress's desire that "investor compensation should be the first priority of a receivership estate" and that these statutes "cast significant doubt that Congress would sanction paying Pritzker Levine from a federal receivership estate." The SEC did not raise, either in this Court or below, the argument pursued by our dissenting colleague that Pritzker's claim is *barred* by these provisions. We therefore decline to consider it. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (emphasizing principle of party presentation). We note, however, that those statutes only state that funds ordered disgorged "shall not be distributed as payment for attorneys' fees or expenses incurred by private parties seeking distribution of the disgorged funds." 15 U.S.C. §§ 77t(f), 78u(d)(4). It is not obvious that Pritzker, who seeks a common fund award, not an award of attorneys' fees or expenses incurred by private parties, fits under this prohibition. Indeed, under the dissent's reading, the statutes would bar the claim even if it were undisputed that Pritzker alone was the sole but-for cause of the state receivership fund and that not a penny would have been obtained by the federal receiver absent those efforts. But we are content to await a case in which the SEC squarely raises the issue before deciding it.

*Gustafson*, 585 F.2d 428, 431 (9th Cir. 1978).[3]

**REVERSED AND REMANDED.**

---

[3]   We grant Pritzker's motion for judicial notice of various filings in the state and federal court proceedings and in the bankruptcy court's adjudication of certain EB-5 entities' Chapter 11 petitions. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

BAKER, Judge, dissenting:

I respectfully dissent for two separate and independent reasons. First, federal law bars Pritzker Levine LLP's claim to attorneys' fees from funds disgorged by defendants in the Securities and Exchange Commission's successful civil enforcement action. But even if this were not the case, I would still affirm the district court because its factual finding that Pritzker was not a but-for cause of the federal receiver's preservation of $26.7 million[1] in defendants' ill-gotten assets is not clearly erroneous.

**1.** Federal law provides that, subject to certain exceptions not relevant here, "funds disgorged as the result of an action brought by the Commission in Federal court . . . shall *not* be distributed as payment for attorneys' fees or expenses incurred by private parties seeking distribution of the disgorged funds." 15 U.S.C. § 77t(f) (emphasis added); *id.* § 78u(d)(4) (materially identical provision). The SEC argues that these provisions represent "Congress's repeated express determinations that

---

[1] As my panel colleagues observe, the state receiver transferred about $25.2 million to the federal receiver. *Ante* at 2. Along with claiming credit for the federal receiver's preservation of that amount, Pritzker also claims credit for the federal receiver's securing of another $1.55 million through the sale of a commercial property that had begun during the state receivership but was completed by the federal receiver. Blue Br. at 26, 29. Thus, Pritzker claims that the total common fund preserved by its efforts is around $26.7 million, *id.* at 29, and it seeks an award of ten percent of that amount, or about $2.67 million, *id.*, which amounts to 198% of the lodestar calculation based on Pritzker's normal hourly rates. *Id.*

investor compensation should be the first priority of a receivership estate in a Commission enforcement action" and "an explicit policy decision by Congress to prioritize compensating investors over private plaintiffs' attorneys in Commission actions." Red Br. at 29–30. The SEC also argues that Pritzker's "claimed entitlement to almost double [its] fees and expenses due to a general equitable doctrine turns these [and other] express Congressional determinations on their head." *Id.* at 32.[2]

In its reply, Pritzker argues that these provisions do not apply because the firm "premises its fee request exclusively on the $25.2 million fund created and preserved in the state-court receivership and transferred to this federal receivership," not "on any money 'disgorged' to the SEC." Gray Br. at 16.[3]

But every penny in the federal receivership estate available for distribution to defrauded investors was disgorged as a result of the district court's determination that defendants violated the federal securities laws. *See Kokesh v. SEC*, 137 S. Ct. 1635, 1643 (2017) ("SEC disgorgement is imposed by the courts as a consequence

---

[2] Although the SEC did not raise this argument in the district court, as appellee it can defend—and we can affirm—the judgment below "on any ground fairly supported by the record." *In re Leavitt*, 171 F.3d 1219, 1223 (9th Cir. 1999). My colleagues contend that the Commission did not raise this statutory defense on appeal and that therefore we should not reach it under the party-presentation rule. *Ante* at 4 n.2. Pritzker, however, devotes more than three pages of its reply responding to the SEC on this issue, which suggests that the firm, like me, thinks the Commission raised it.

[3] *But see above* note 1.

for violating . . . public laws."); *see also* Dkt. No. 1, at 20–24, Case No. 3:17-cv-00223 (N.D. Cal. Jan. 17, 2017) (SEC complaint alleging violations of Section 10(b) of the Exchange Act and 17(a) of the Securities Act and seeking as relief "an order requiring Defendants . . . to disgorge their ill-gotten gains"). Without the district court's various determinations that defendants were liable for these alleged federal securities law violations and therefore required to disgorge their illicit gains, *see, e.g.*, Dkt. No. 543, at 1, Case No. 3:17-cv-00223 (N.D. Cal. Jan. 10, 2019) (granting the SEC's motion for partial summary judgment and finding, *inter alia*, that defendant North America 3PL, LLC, "violated the securities laws" and "based on that liability," requiring it to "disgorge the sum of $23.9 million, representing ill-gotten gains"), the SEC would have needed to return to defendants all assets secured by the federal receiver.

Thus, and contrary to Pritzker's argument that its claim is not premised on funds disgorged to the SEC, disgorgement here came exclusively through the district court's liability determinations, as disgorgement is a "penalty" for "violating a public law." *Kokesh*, 137 S. Ct. at 1644; *see also* 15 U.S.C. § 78u(d)(7) ("In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement."). As the funds from which Pritzker seeks payment were all disgorged "as the result of an

3

action brought by the Commission in Federal court," 15 U.S.C. §§ 77t(f), 78u(d)(4), these provisions bar Pritzker's claim.

Pritzker also argues that these provisions are inapplicable because it does not seek "compensation for successfully obtaining a portion of any 'disgorged funds' on behalf of any investor or creditor." Gray Br. at 16. Pritzker asserts that it "instead seeks compensation for the substantial work it performed in conferring a benefit on all investors and creditors through the creation and preservation of the cash fund in the state-court action." *Id*. at 16–17. But those investors and creditors indisputably seek "distribution of the disgorged funds" under §§ 77t(f) and 78u(d)(4), and Pritzker seeks its own "distribut[ion]" of "funds disgorged" "as payment for attorneys' fees" liability "incurred by" those investors and creditors for the firm's services under the common-fund doctrine. 15 U.S.C. §§ 77t(f), 78u(d)(4). These provisions squarely preempt that equitable doctrine.[4]

**2.** Moreover, even if federal law did not bar Pritzker's claim, I would still affirm the district court. My panel colleagues write that Pritzker's

> efforts in the state court litigation . . . undeniably caused the creation, discovery, increase, or preservation of a common fund that benefited

___

[4] To preserve its claim (if any) to fees derived from assets marshaled by the state receiver, Pritzker or its client Young needed to appeal the district court's prior orders staying pending state-court litigation and transferring those assets to the federal receiver over Young's objections. *See* Dkt. No. 96, Case No. 3:17-cv-00223 (N.D. Cal. Mar. 23, 2017); Dkt. No. 100, Case No. 3:17-cv-00223 (N.D. Cal. Mar. 29, 2017). No such appeal was taken.

investors at the conclusion of the federal action. . . . The district court's speculation that the funds transferred from the state receiver might still have been recovered by the federal receiver in the absence of the state receivership therefore finds no support in the record and in any event does not demonstrate that Pritzker's efforts were not a 'cause-in-fact' of the creation, increase, or preservation of the common fund.

*Ante* at 3 (emphasis added and citation omitted).

My colleagues allude to the district court's factual finding that "the bulk of the assets taken into the [state] receivership were large commercial properties" and that it was "at least somewhat speculative to assume that those properties could have been sold and the proceeds placed beyond the reach of the SEC before this action was filed." In effect, the district court found that Pritzker was not a cause-in-fact or but-for cause[5] of the federal receiver's securing of $26.7 million in assets that the firm contends is a common fund.

This factual finding "must not be set aside unless clearly erroneous." Fed. R. Civ. P. 52(a)(6). "Review under the clearly erroneous standard requires considerable deference; the findings of the district court should stand unless the appellate court has the 'definite and firm conviction that a mistake has been committed.' " *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1024 (9th Cir. 1999) (quoting

---

[5] A " 'cause in fact[ ]' . . . is[ ] an event that, not necessarily alone, brings about a given result. A 'but for' cause is cause in fact." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 991 (9th Cir. 2008) (Noonan, J., concurring).

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 623 (1993)). Thus, if the district court's "account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* (quoting *Phoenix Eng'g & Supply Inc. v. Universal Elec. Co.*, 104 F.3d 1137, 1141 (9th Cir.1997)).

In the district court, Pritzker had the burden of establishing by a preponderance of the evidence that but for its state-court litigation efforts, the $26.7 million recovered by the federal receiver would have been dissipated before the receiver could have secured it. *Cf. Burrage v. United States*, 571 U.S. 204, 211 (2014) (noting that but-for causation "requires proof that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct") (cleaned up and quoting *Univ. of Tex. Southwestern Medical Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013)).

Evaluating whether Pritzker met its burden required the district court to make a counterfactual finding about how much, if any, of the $26.7 million in assets claimed by Pritzker as constituting the common fund would have been available to the federal receiver absent Pritzker's involvement. *Cf. June v. Union Carbide Corp.*, 577 F.3d 1234, 1240 (10th Cir. 2009) (observing that the " 'but-for test' . . . 'requires a counterfactual inquiry' in which the court considers 'what would have occurred if

6

the actor had not engaged in the . . . conduct' " at issue) (quoting proposed final draft of the *Restatement (Third) of Torts* § 26 cmt. e).

Here, the district court undertook that counterfactual inquiry, which my colleagues condemn as mere "speculation." *Ante* at 3. But "[c]ounterfactuals by their nature . . . *require the fact finder to speculate* what would have happened if the defendant had not done what she in actual fact did." Stanford Encyclopedia of Philosophy, *Causation in Law* § 5.1.1 (2019) (emphasis added), available at https://plato.stanford.edu/entries/causation-law/ (accessed Feb. 11, 2022); *cf. Grp. Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760 (8th Cir. 2003) (observing, in the context of the admissibility of expert testimony, that "cases involving counterfactual estimations essentially come down to this: *A certain amount of speculation is necessary*, an even greater amount is permissible (and goes to the weight of the testimony), but too much is fatal to admission.") (emphasis added).

Pritzker's argument—that, but for its involvement, the assets would have been dissipated—is just as speculative as the district court's factual finding to the contrary. The relevant question, therefore, is whether the district court's necessarily speculative counterfactual finding was still "plausible in light of the record viewed in its entirety." *Ambassador Hotel*, 189 F.3d at 1024.

On the one hand, weighing against that finding is, as my colleagues point out, the federal receiver's statement to the district court that "[a]bsent the actions taken

7

by Pritzker Levine" in securing the appointment of the state receiver, defendants "would have stripped all of the assets (or value) . . . leaving not a penny for investors (or creditors)."

On the other hand, Pritzker filed its state-court suit against certain of the federal defendants on behalf of its client Young in July 2015. Blue Br. at 16. That lawsuit was an early warning indicator to them and the other fraudsters to take the EB-5 investor money and run. But eight months later in March 2016, when Pritzker successfully moved the state court to appoint a receiver, *id.* at 18, that receiver took possession of some $8 million in cash and three commercial properties that the state-court defendants were marketing, *id.* If the state-court defendants meant to dissipate their ill-gotten EB-5 investor assets to escape potential judgment by their creditors, they bungled the job.

Thus, because the fraudsters did not dissipate their EB-5 investor assets in the eight months between Pritzker's filing of Young's suit and Pritzker's motion for appointment of a state-court receiver, a factfinder could have reasonably concluded that if Young had *not* filed suit, the assets would still have been available when the district court appointed a federal receiver in January 2017. After all, in the counterfactual world where Young never files suit and the fraudsters receive no warning, the fraudsters would have little incentive to dissipate the assets. And in the real

8

world, even when Pritzker's filing of Young's suit in July 2015 gave them every incentive to dissipate, defendants still dawdled.

In sum, weighing the evidence here involved a complicated, speculative counterfactual judgment by the district court. Pritzker prevails on appeal only if the record *compels*—not merely permits—the opposite counterfactual conclusion: despite the fraudsters' failure to dissipate the assets even *after* they were tipped off by Young's state-court suit, if Young had *not* filed suit those fraudsters would have dissipated those assets by January 2017. *Cf. United States v. Zielezinski*, 756 F.2d 1448, 1448 (9th Cir. 1985) (per curiam) (upholding the district court's factual finding under the clearly erroneous standard because "[a] review of the record discloses nothing that compels a reversal of [the] finding as clearly erroneous"); *see also United States v. Working*, 224 F.3d 1093, 1102 (9th Cir. 2000) (en banc) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985)).

I see nothing in the record that compels—rather than permits—the counterfactual theory urged by Pritzker and adopted by my colleagues. Thus, the district court's factual finding that Pritzker is not a but-for cause of the federal receiver's securing of the assets is not clearly erroneous. Under the deferential standard of review applicable to that finding, we should affirm the district court's denial of

Pritzker's attorneys' fees claim, even if, after weighing the evidence, we would reach a different conclusion.

* * *

For the reasons set forth above, I respectfully dissent.